## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JERROLD DOLINS, on behalf of himself, individually, and on behalf of all others similarly situated,

                      Plaintiff,

      v.

CONTINENTAL CASUALTY COMPANY;
CONTINENTAL ASSURANCE COMPANY;
CNA FINANCIAL CORPORATION;
INVESTMENT COMMITTEE OF THE CNA
401(k) PLUS PLAN; NORTHERN TRUST
COMPANY; and DOES 1 through 10,

                      Defendants.

**CASE NO.**

**COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     JURISDICTION ............................................................................................. 2

III.    VENUE ........................................................................................................... 3

IV.     THE PARTIES AND THE PLAN ................................................................. 3

V.      FACTS ........................................................................................................... 7

        A.      The CNA Fund, the Contract, and the Minimum Interest Guarantee
                Rider ................................................................................................... 7

        B.      Cancelling the Contract .................................................................... 9

VI.     CLASS ACTION ALLEGATIONS ............................................................ 11

VII.    CLAIMS FOR RELIEF ............................................................................... 14

        FIRST CLAIM FOR RELIEF ..................................................................... 14

        Breach of Fiduciary Duty Under ERISA §§ 502(a)(2) and (a)(3),
                29 U.S.C. §§ 1132(a)(2) and (a)(3), Against All Defendants ........... 14

        SECOND CLAIM FOR RELIEF ................................................................. 17

        Engaging in Prohibited Transactions Forbidden by ERISA § 406(b),
                29 U.S.C. § 1106(b), Against All Defendants .................................... 17

        THIRD CLAIM FOR RELIEF ..................................................................... 19

        Engaging in Prohibited Transactions Forbidden by ERISA § 406(a),
                29 U.S.C. § 1106(a), Against All Defendants .................................... 19

        FOURTH CLAIM FOR RELIEF ................................................................. 21

        Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3),
                For Co-Fiduciary Liability Under ERISA § 405(a),
                29 U.S.C. § 1105(a), Against the Fiduciary Defendants .................... 21

VIII.   PRAYER FOR RELIEF ............................................................................... 22

i

## I.    INTRODUCTION

1.    Plaintiff Jerrold Dolins ("Plaintiff") brings this class action individually and on behalf of a class of similarly situated participants in the CNA 401(k) Plus Plan ("the Plan"), all of whom invested some or all of their Plan accounts in the CNA Fixed Income Fund (the "CNA Fund").[1] At all relevant times, the Plan has been sponsored and administered by Continental Casualty Company ("CCC").  At all relevant times, CNA Financial Corporation ("CNA") held a controlling interest in CCC.

2.    Until 2012, the vast majority of the assets in the CNA Fund were invested in a group annuity contract ("the Contract") offered by Continental Assurance Company ("CAC"), then a wholly owned subsidiary of CCC (Contract No. GP-84111-R).

3.    The Plan originally entered into the Contract with CAC in 1981. In 1990, the Plan and CAC executed a "Minimum Interest Guarantee Rider" that guaranteed that the rate of interest credited to the CNA Fund under the Contract would never drop below 4% per year.

4.    This 4% guarantee remained in place until the Plan fiduciaries chose to cancel the Contract effective December 31, 2011. Since 2011, returns earned by the Plan on assets that participants invested in the CNA Fund have dropped significantly. In 2012, the Plan earned a net 3.01% return on assets invested in the CNA Fund. In 2013 this dropped to 2.21%; it dropped still further to 1.64% in 2014 and 1.54% in 2015.

5.    The Plan fiduciaries' decision to cancel the Contract harmed Plaintiff and other Class Members because it eliminated a guaranteed 4% interest rate on assets invested in the CNA Fund, a rate that was very favorable in the interest rate environment

---

[1] At some point after the events relevant to this Complaint, the name of the CNA Fund was changed to the Invesco Stable Value Fund.

in 2012 through the present. Without this 4% guarantee, the Plan has earned a lower rate of return on the assets it has invested pursuant to the Contract, and Class Members' accounts have earned a lower rate of return on the amounts therein allocated to the CNA Fund.

6.      There was no good reason for the Plan fiduciaries to terminate the Contract and eliminate the favorable 4% interest guarantee, and that decision was not made in the sole interest of the Plan's participants and their beneficiaries.  In fact, on information and belief, the decision to terminate the Contract was made for the benefit of CCC, the parent company of CAC, and/or for the benefit of CNA, in order to increase the profits of CCC and/or to make CAC more attractive to potential buyers and/or to decrease the risk of CAC having to show large losses for GAAP purposes because of the large amount of its assets attributable to the Contract.

7.      In cancelling the Contract, the Plan fiduciaries breached their fiduciary duties under the Employee Retirement Income Security Act ("ERISA") because they failed (1) to act solely in the interest of Plan participants and beneficiaries; and (2) to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

8.      Further, in cancelling the Contract, the Plan fiduciaries caused the Plan to engage in prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106.

## II.      JURISDICTION

9.      This action is brought by Plaintiff pursuant to ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3). This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 58 and 65 of the Federal Rules of Civil Procedure.

10. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), provides for nationwide service of process. All Defendants are residents of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in Illinois. Each Defendant systematically and continuously conducts business in this State and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction.

### III.   VENUE

11. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), because Defendants reside or may be found in this district and some or all of the fiduciary breaches or all of the events or omissions giving rise to the claims occurred or originated within this district.

### IV.   THE PARTIES AND THE PLAN

12. Plaintiff Jerrold Dolins is a former employee of CNA and at all relevant times has been a participant in the Plan, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7). At all times since he became a participant in the Plan at the time of its inception in 1978, 100% of the Plan assets in Plaintiff Dolins' Plan account have been invested in the CNA Fund.  Mr. Dolins is a resident of Buffalo Grove, Illinois, in Lake County.

13. At all relevant times, the Plan has been an employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and an individual account plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  The Plan was

3

established in 1978, and at various times in the past, the Plan was named the CNA Savings and Capital Accumulation Plan and the CNA Employees' Savings Plan. As of 2011, the Plan had over $1.3 billion in assets and approximately 10,000 participants.

14. At all relevant times, Defendant Continental Casualty Company ("CCC") has been the Plan sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), the named Plan fiduciary within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), and the Plan administrator within the meaning of ERISA § 3 (16)(A), 29 U.S.C. § 1002(16)(A). As the named fiduciary and Plan administrator, CCC was a Plan fiduciary. In addition, or in the alternative, at all relevant times, CCC was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management or disposition of its assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan. CCC was organized under the laws of the State of Illinois.

15. Defendant Continental Assurance Company ("CAC") was until 2014 a wholly owned subsidiary of CCC. As such, CAC was at all relevant times a party-in-interest with respect to the Plan within the meaning of ERISA § 3(14)(G), 29 U.S.C. § 1002(14)(G). In addition, by reason of its contract with the Plan, as described further below, CAC was a party-in-interest with respect to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B). CAC was organized under the laws of the State of Illinois.

4

16.     Defendant CNA Financial Corporation ("CNA") is an insurance holding company located in Chicago, Illinois.  At all relevant times, CNA Financial has been the direct or indirect owner of Defendant CCC.  CNA also was the direct or indirect owner of CAC until CAC was sold to Wilton RE on August 1, 2014.  At all relevant times, CNA employees have been eligible to participate in the Plan, making CNA a party in interest with respect to the Plan within the meaning of ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C). Further, at all relevant times, Defendant CNA was a fiduciary within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), because it exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management or disposition of its assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan.  For example, CNA Plan participants received communications assuring them with respect to the Fund that "CNA routinely evaluates the investment funds available through [the Plan] to ensure the plan remains competitive and offers a combination of quality and value-based funds."

17.     On information and belief, pursuant to the terms of the Plan, at all relevant times the Investment Committee of the Plan (the "Committee") was responsible for the investment of Plan assets and for directing the Plan's Trustee with regard to such investment.  At all relevant times, Defendant Committee was a fiduciary within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), because it exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management or disposition of its assets and/or

had discretionary authority or discretionary responsibility in the administration of the Plan. Plaintiff is not currently aware of the identities of the members of the Committee.

18.     At all relevant times, Defendant Northern Trust Company ("Northern Trust") has been the trustee of the Plan within the meaning of ERISA §403(a), 29 U.S.C. § 1103(a), with authority to control and manage the assets of the Plan, and a Plan fiduciary within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21) by reason of its exercise of that authority. Under the terms of the governing plan document, at all relevant times Northern Trust was to have invested Plan assets pursuant to the instruction of an Investment Committee established pursuant to the terms of the Plan. To the degree that no such Committee was properly appointed or such a Committee did not properly authorize the cancellation of the Contract pursuant to the terms of the governing Plan document, the actions of Northern Trust were not properly directed under the terms of the Plan, and the actions of Northern Trust were taken in a fully discretionary capacity. To the extent that an Investment Committee was properly appointed and properly instructed Northern Trust to enter into such cancellation, Northern Trust still retained the discretionary authority to question and disregard that instruction under the circumstances, including but not limited to the circumstances that on the face of the transaction (1) there was no benefit to the Plan and its participants, and (2) there was an obvious potential conflict of interest given the fact that both CAC and CCC were owned by CNA Financial.

19.     Doe Defendants 1-10 are individuals or entities that are found in the course of this litigation to be one or more of the following:

(a)     Plan fiduciaries within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A);

(b)     Parties in interest with respect to the Plan within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14);

(c)     Knowing participants in the breaches of fiduciary duty set forth in this Complaint.

20.     Together, Defendants CCC, CNA, the Committee, and Northern Trust, along with any Doe Defendants that are found to be fiduciaries of the Plan, are "Fiduciary Defendants."

## V.     FACTS

**A.     The CNA Fund, the Contract, and the Minimum Interest Guarantee Rider**

21.     While CNA historically offered its employees a traditional defined benefit pension plan, since 1999, new CNA employees have not had this option, and instead have been offered only the ability to participate in the Plan. In addition, CNA has encouraged its long-time employees to cash out their benefits under the old defined benefit plan and roll over the resulting funds into the Plan. As a result, the Plan is the only or primary source of retirement income for large numbers of CNA employees and retirees.

22.     The Plan offers a number of investment options, and allows participants to allocate their contributions and other Plan assets in their accounts among those options. At all relevant times, one of those options has been the CNA Fixed Income Fund ("the CNA Fund").

23.     The CNA Fund was and is designed to offer a conservative investment option that preserves the money in a participant's account while offering modest growth. In order to achieve this goal, the CNA Fund has been divided among several conservative investments.

24.     Until 2012, one of the core investments of the CNA Fund was a group annuity contract (the "Contract") purchased from CAC. Until August 1, 2014, CAC was a wholly owned subsidiary of CNA.

25.     In 1981, the Plan entered into the Contract, Group Annuity Contract No. GP 84111-R. The Contract was referred to by the Plan as the "CNA GFIF."

26.     Article IV Section 1 of the Contract provided that CAC had the right to discontinue the Contract only after the occurrence of certain specified scenarios:  the failure of the Plan to qualify under Section 401(a) of the Internal Revenue Code, the failure of the Plan trustees to make required contributions, or the decision of the Plan trustees or sponsor to make other funding arrangements for the Plan other than those specified in the Contract.  Other than under those circumstances, CAC had no right to discontinue the Contract. None of these circumstances occurred here, and CAC did not attempt to exercise any right to cancel the Contract pursuant to this provision.

27.     In contrast, Article IV Section 2 of the Contract provided that the Plan had the right to terminate the contract at any time.  As a result, if the interest rate was disadvantageous to the insurer, but advantageous to Plan participants, the decision to continue the Contract was within the sole discretion of the Plan's fiduciaries.

28.     In 1990, the Plan and CAC executed a Minimum Interest Guarantee Rider that guaranteed that the rate of interest credited to the CNA Fund under the Contract would never drop below 4% per year.

29.     The Contract was historically the best performing investment in the CNA Fund. For example, the Contract had the highest rate of return before fees of the CNA Fund's investments each year between 2007 and 2011. In 2007, the Contract had a

6.5% credited rate (gross rate of return), while the CNA Fund's other investments had returns of 4.54% and 5.3%. In 2008, the Contract maintained the same 6.5% gross rate of return, while the returns on the CNA Fund's other investments dropped to 4.02% and 2.24%. In 2009, the Contract had a 6.25% gross rate of return, while the returns on the other investments dropped to only 1.71% and 0.357%. By 2010 and 2011, the gross rate of return on the Contract had fallen to 4.55% and 4.00% respectively, but this was still significantly higher than the credited rate on the Fund's other investments, which were 1.96% and 0.89%.

30.     In addition to the significantly higher rate of return, the Contract offered lower annual fees than the CNA Fund's other investments. During this same 2007-2009 period, the Contract had annual fees of just 0.12%, while the CNA Fund's other investments had fees of 0.18%. In 2010-11, these other investments had still higher fees of 0.78% and 0.27%, while the fees on the Contract remained at 0.12%.  On information and belief, the Fund's fees on all of its investments since cancellation of the Contract have been higher than 0.12%.

31.     Due to the Contract's significantly higher returns and lower fees, the majority of the CNA Fund's assets were historically invested in the Contract. For each year between 2007 and 2009, more than 75% of the CNA Fund's assets were invested in the Contract, representing between $289 million and $347 million. These figures rose to $362 million in 2010 and $365 million in 2011.

**B.      Cancelling the Contract**

32.     By the mid-2000s, interest rates had fallen much lower than they had been when the Plan first executed the Minimum Interest Guarantee Rider in 1990. The

9

guaranteed 4% interest rate was thus a very favorable rate for the Plan and its participants with some or all of their account balances invested in the CNA Fund.

33.     Given the interest rate environment at that time, the terms of the Contract were increasingly unfavorable to CAC, as interest rates fell and CAC was required to continue paying the 4% minimum guaranteed credited rate to the Plan.

34.     On information and belief, by the late 2000s, CNA began exploring the option of selling (in parts or in whole) its wholly-owned subsidiary CAC. CNA had incentive to eliminate the interest rate guarantee in order to maximize the potential sale price, to remove a large concentrated risk, and/or to decrease the risk of CAC having to show a large loss pursuant to GAAP accounting standards.

35.     On December 29, 2011, Northern Trust and CAC executed Amendment 14 to the Contract. Amendment 14 provided that "at the request of" the Plan trustee, the Contract was being discontinued pursuant to the terms of Article IV, Section 2 of the Contract.

36.     On information and belief, CNA was party to the decision to terminate the Contract because it exercised discretion in reviewing and selecting investments for the Plan on an ongoing basis, as alleged in Paragraph 16, above.

37.     After the cancellation of the Contract, the net rates that the Plan earned on assets invested in the CNA Fund dropped precipitously. In 2007, 2008, and 2009, net rates of return on the CNA Fund were 6.01%, 5.71%, and 4.88%, respectively. In 2011, immediately prior to the cancellation of the Contract, the net rate of return on the

CNA Fund was 3.26%.[2] After the cancellation of the Contract this fell to 3.01% in 2012, 2.21% in 2013, 1.65% in 2014, and 1.54% in 2015.

38.     In addition to causing a lower gross rate of return, the cancellation of the Contract resulted in higher fees charged to the Plan for the assets held in the Fund, as alleged in Paragraph 30, above The current fees charged to the Fund are 0.34%, significantly higher than the 0.12% charged under the Contract.

39.     CNA ultimately sold CAC for over $615 million in 2014.

## VI.     CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated ("the Class"):

> All participants in and beneficiaries of the CNA 401(k) Plus Plan who had funds in their Plan accounts invested in the CNA Fixed Income Fund at any time between 2012 and the time of trial. Excluded from the Class are any and all individuals who are determined to be Plan fiduciaries.

41.     The exact number of Class Members is unknown to Plaintiff at this time, but may be readily determined from records maintained by CCC. At all relevant times, there were approximately 10,000 participants in the Plan. Upon information and belief, many, if not all, of those persons are likely members of the Class, and thus the Class is so numerous that joinder of all members is impracticable.

42.     Common questions of law and fact exist as to all members of the Class, including but not limited to:

---

[2] This figure is lower than the Contract's 4% 2011 rate of return referenced in paragraph 28 above for two reasons. First, the CNA Fund contained investments other than the Contract, all of which had lower rates of return than the Contract, driving down the average rate of return for the whole Fund. Second, the 4% credited rate reflects the amount credited to the Plan before fees. Since the Contract's fees for 2011 were 0.12%, the actual rate of return on the Contract in 2011 was 3.88%.

a.      whether each Defendant alleged to be a fiduciary was a fiduciary of the Plan;

b.      whether each of the Fiduciary Defendants breached its fiduciary duties in cancelling the Contract, thus eliminating the 4% guaranteed interest rate;

c.      whether the Fiduciary Defendants engaged in a prohibited transaction in cancelling the Contract;

d.      whether Defendant CAC was a party in interest to the Plan within the meaning of ERISA;

e.      whether Defendant CAC is liable as a party in interest and/or as a knowing participant in one or more other Defendants' breaches of fiduciary duty; and

f.      whether Defendant CNA, if it was not a fiduciary, is liable as a knowing participant in one or more other Defendants' breaches of fiduciary duty.

43.      Plaintiff's claims are typical of the claims of the other members of the Class because his claims arise from the same event, practice and/or course of conduct, namely the Plan fiduciaries' decision to cancel the Contract. Plaintiff's claims are also typical of those of the other members of the Class because all Class Members were similarly harmed by Defendants' wrongful conduct in that all of them received lower returns on their Plan accounts.

44.      Plaintiff's claims are also typical of the claims of the other members of the Class because the relief Plaintiff seeks—namely, the restoration to the Plan of losses it experienced because of the Plan fiduciaries' decision to cancel the Contract—will affect all Class Members in the same way.

45.      Defendants do not have any defenses unique to Plaintiff's claims that would make Plaintiff's claims atypical of the remainder of the Class.

46.     Plaintiff will fairly and adequately represent and protect the interests of all members of the Class because neither Plaintiff nor his counsel have any interests antagonistic to or in conflict with the interests of the Class, and Plaintiff has engaged counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

47.     Class certification is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

48.     Class certification is appropriate under Rule 23(b)(1)(B) because adjudications the claims for relief herein by individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede the ability of other members of the Class to protect their interests.

49.     Class action status is also warranted under Rule 23(b)(2) because by cancelling the Contract, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

50.     If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under Rule 23(b)(3) is appropriate because common issues of law and fact predominate over any questions affecting only individual members. The common issues of law or fact include, but are not necessarily limited to those set forth in Paragraph 42 above.  The only individualized issues will be the amount of the Plan's recovery that will be allocated to each Class Member's Plan account, and that allocation can be readily calculated based on

the Plan's records. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

    a.  Individual Class Members do not have an interest in controlling the prosecution of these claims in individual actions rather than a class action because the relief sought by any Class Member will inure to the benefit of the Plan and/or affect each Class Member in the same manner;

    b.  Individual Class Members also do not have an interest in controlling the prosecution of these claims because the monetary relief that they could seek in any individual action is identical to the relief that is being sought on their behalf herein;

    c.  On information and belief, there is no other litigation begun by any other Class Members concerning the issues raised in this litigation;

    d.  This litigation is properly concentrated in this forum, which is where Defendants do business and where Plaintiff Dolins lives and accrued benefits; and

    e.  There are no difficulties managing this case as a class action.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Breach of Fiduciary Duty Under ERISA §§ 502(a)(2) and (a)(3),
29 U.S.C. §§ 1132(a)(2) and (a)(3), Against All Defendants**

51.    Plaintiff incorporates by reference Paragraphs 1 through 50, as though fully set forth herein.

52.    This claim is brought against all Defendants.

53.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part, that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the Plan's participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person

14

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

54.     These fiduciary duties under ERISA §§ 404(a)(1), 404(a)(1)(A), and (B) are referred to as the duties of loyalty and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

55.     In making decisions about what investments to select, maintain, and eliminate from a plan, a fiduciary must act prudently and in the sole interests of plan participants.

56.     By cancelling the Contract, thus depriving the Plan and its participants of the highly favorable guaranteed 4% interest rate under the Contract's terms, the Fiduciary Defendants breached these duties.

57.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

58.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring suit for relief for the Plan under ERISA § 409.

59.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA, which include its fiduciary responsibility provisions.

60. Defendants' breaches of fiduciary duty caused direct injury and losses to Plaintiff and each member of the Class.

61. Neither fiduciary nor party-in-interest status is required for liability under ERISA where non-fiduciaries participate in and/or profit from a fiduciary's breach of duty or a prohibited transaction. Accordingly, Plaintiff may bring claims against such persons even if they are not found to have fiduciary or party-in-interest status. Such persons must disgorge unjust profits and are subject to other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and pursuant to the Supreme Court's decision in *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

62. If CNA is not found to be a fiduciary within the meaning of ERISA as to the acts and omissions complained of herein, then CNA knowingly participated in the breaches of ERISA's fiduciary responsibility provisions set forth above.

63. CAC knowingly participated in the breaches of ERISA's fiduciary responsibility provisions set forth above.

64. Plaintiff and the Class seek to have the Plan recover damages or, in the alternative, to have the Plan's and their losses restored as appropriate equitable relief, and/or seek other appropriate equitable relief, including but not limited to disgorgement of profits, restitution, or surcharge, along with such other and additional relief enumerated in the Prayer and/or as may be otherwise available.

## SECOND CLAIM FOR RELIEF

### Engaging in Prohibited Transactions Forbidden by ERISA
### § 406(b), 29 U.S.C. § 1106(b), Against All Defendants

65. Plaintiff incorporates by reference each of Paragraphs 1 through 50 as though fully set forth herein.

66. This claim is brought against all Defendants.

67. ERISA § 406(b), 29 U.S.C. 1106(b), provides, *inter alia*, that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries...."

68. ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

69. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring suit for relief for the Plan under ERISA § 409.

70. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA, which includes its fiduciary responsibility provisions.

71.     The Fiduciary Defendants engaged in prohibited transactions in violation of ERISA § 406(b) by dealing with the assets of the Plan in their own interests or accounts and/or the interests or accounts of CAC and/or CNA. Specifically, the Fiduciary Defendants caused the Plan to cancel the Contract because cancelling the Contract avoided CAC's obligation to pay higher interest rates to the Plan and its participants, and/or decreased the risk of having to show large losses for GAAP purposes, and/or enabled CNA to sell CAC for more money than it otherwise would have received from a sale.

72.     The Fiduciary Defendants' violations of ERISA §406(b) caused direct injury and losses to Plaintiff and each member of the Class.

73.     Neither fiduciary nor party-in-interest status is required for liability under ERISA where non-fiduciaries participate in and/or profit from a fiduciary's breach of duty or a prohibited transaction. Accordingly, Plaintiff may bring claims against such entities even if they are not found to have fiduciary or party-in-interest status themselves. Such entities must disgorge unjust profits and are subject to other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and pursuant to the Supreme Court's decision in *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

74.     If CNA is not found to be a fiduciary within the meaning of ERISA as to the acts and omissions complained of herein, then CNA knowingly participated in the breaches of ERISA's fiduciary responsibility provisions set forth above.

75.     CAC knowingly participated in the breaches of ERISA's prohibited transaction provisions set forth above.

76.    Plaintiff and the Class seek to have the Plan recover damages or, in the alternative, to have the Plan's and their losses restored as appropriate equitable relief, and/or seek other appropriate equitable relief, including but not limited to disgorgement of profits, restitution, or surcharge, along with such other and additional relief enumerated in the Prayer and/or as may be otherwise available.

### THIRD CLAIM FOR RELIEF

**Engaging in Prohibited Transactions Forbidden by ERISA
§ 406(a), 29 U.S.C. § 1106(a), Against All Defendants**

77.    Plaintiff incorporates by reference Paragraphs 1 through 50 as though fully set forth herein.

78.    This claim is brought against all Defendants.

79.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

80.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring suit for relief for the Plan under ERISA § 409.

81.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan, which include its fiduciary responsibility provisions.

82.     ERISA § 406(a), 29 U.S.C. § 1106(a), prohibits fiduciaries from causing a plan to engage in a transaction, "if the fiduciary knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, of any property between the plan and a party in interest … (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; . . . ."

83.     The Fiduciary Defendants violated ERISA § 406(a) by causing the Plan to engage in one or more transactions with CAC that Defendants knew or should have known constituted direct or indirect (1) sales or exchanges of property between the Plan and CAC, as a party in interest under ERISA § 406(a)(1)(A), (2) furnishings of goods, services, or facilities to the Plans by CAC, a party in interest under ERISA § 406(a)(1)(B), and/or (3) transfers to, or use by or for the benefit of CAC, a party in interest, of assets of the Plans under ERISA § 406(a)(1)(C).

84.     The Fiduciary Defendants' breaches of ERISA's prohibited transaction provisions caused direct injury and losses to Plaintiff and the Class.

85.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and the Supreme Court's decision in *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000), a party-in-interest may be subject to appropriate equitable relief for a violation of ERISA §406(a) if it had actual or constructive knowledge of the circumstances that make a transaction a violation of ERISA § 406.

86.     Defendant CAC had actual or constructive knowledge of the circumstances that made its transactions with the Plan violations of ERISA §406(a).

87.     Plaintiff and the Class seek to have the Plan recover damages or, in the alternative, to have the Plan's and their losses restored as appropriate equitable relief, and/or seek other appropriate equitable relief, including but not limited to disgorgement of profits, restitution, or surcharge, along with such other and additional relief enumerated in the Prayer and/or as may be otherwise available.

### FOURTH CLAIM FOR RELIEF

**Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C.
§ 1132(a)(3), For Co-Fiduciary Liability Under ERISA § 405(a),
29 U.S.C. § 1105(a), Against the Fiduciary Defendants**

88.     Plaintiff incorporates by reference Paragraphs 1 through 50 as though fully set forth herein.

89.     This claim is brought against the Fiduciary Defendants.

90.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

91.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring suit for relief for the Plan under ERISA § 409.

92.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan, which include its fiduciary responsibility provisions.

93.     ERISA § 405(a), 29 U.S.C. § 1105(a), provides that a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)  if, by his failure to comply with [ERISA § 404(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)  if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

94.     Each of the Fiduciary Defendants knowingly participated in the breach of each other Fiduciary Defendant by directly or indirectly causing and/or knowingly permitting the cancellation of the Contract, and/or by failing to comply with ERISA § 404(a)(1) in the administration of its responsibilities, thus enabling the other fiduciary to commit a breach.

95.     Co-fiduciary liability is joint and several under ERISA, and thus, the Fiduciary Defendants are jointly and severally liable to Plaintiff and the Class for each of the other's breaches of ERISA's fiduciary responsibility provisions.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief as follows as applicable for the particular cause of action:

> (1) An Order certifying this action to proceed on behalf of the Class, and appointing Plaintiff and the counsel listed below to represent the Class;

(2) An Order finding that Defendants violated their fiduciary duties to the Plaintiff Class and awarding the Plan and the Class such relief as the Court deems proper;

(3) An Order finding that Defendants engaged in prohibited transactions and awarding the Plan and the Class such relief as the Court deems proper;

(4) An Order finding that Defendants are jointly and severally liable as co-fiduciaries and/or as fiduciaries and party in interest and/or as a fiduciaries and non-fiduciary participant(s) in violations of ERISA;

(5) An Order enjoining the Fiduciary Defendants from causing the Plan to engage in further prohibited transactions and violations of their fiduciary responsibilities;

(6) An Order awarding the Plan and the Class other appropriate equitable and injunctive relief to the extent permitted by the above claims;

(7) An Order awarding Plaintiff's counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine; and

(8) An Order awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

DATED this 7th day of September, 2016.

KELLER ROHRBACK L.L.P.

By: /s/ Jeffrey Lewis (Pro hac vice to be filed)
Jeffrey Lewis, CA Bar No. 66587
Jacob Richards, CA Bar No. 273476
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Phone: (510) 463-3900
Fax: (510) 463-3901
Email: jlewis@kellerrohrback.com
Email: jrichards@kellerrohrback.com

By: /s/ Erin M. Riley (Pro hac vice to be filed)
Erin M. Riley
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Phone: (206) 623-1900

Fax: (206) 623-3384
Email: eriley@kellerrohrback.com

LEVUN GOODMAN & COHEN, LLP

By: */s/ Lawrence S. Goodman*
Lawrence S. Goodman
500 Skokie Blvd., Suite 650
Northbrook, IL 60062
Phone: (847) 509-7700
Fax: (847) 849-5686
Email: LSGoodman@lgclaw.com