UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JERROLD DOLINS, on behalf of himself and others similarly situated, | ) ) ) 16 C 8898 |
| Plaintiff, | ) ) ) Judge Gary Feinerman |
| vs. | ) ) |
| CONTINENTAL CASUALTY COMPANY, CONTINENTAL ASSURANCE COMPANY, CNA FINANCIAL CORPORATION, INVESTMENT COMMITTEE OF THE CNA 401(k) PLUS PLAN, NORTHERN TRUST COMPANY, and DOES 1-10, | ) ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Jerrold Dolins alleges in this putative class action that CNA Financial Corporation, the Investment Committee of the CNA 401(k) Plus Plan, and Continental Casualty Company (collectively, "CNA Defendants"), as well as Continental Assurance Company ("CAC") and Northern Trust Company, violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, in connection with the cancellation of a group annuity contract. Doc. 1. CAC and Northern Trust move under Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims against them, while the CNA Defendants move to dismiss one claim. Docs. 39, 40, 49. The motions are denied, except as to Dolins's request for damages relief against CAC.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider

"documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Dolins's briefs opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). The facts are set forth as favorably to Dolins as those materials allow. *See Pierce v. Zoetis*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

Dolins is a former employee of CNA Financial, an insurance holding company. Doc. 1 at ¶¶ 12, 16. Dolins was a participant in the CNA 401k Plus Plan ("the Plan"), an employee pension benefit plan. *Id*. at ¶ 13. The Plan was sponsored and administered by Continental Casualty Company ("CCC"), in which CNA held a controlling interest at all relevant times. *Id*. at ¶¶ 1, 14. Northern Trust was the Plan's trustee. *Id*. at ¶ 18.

One of the Plan's investment options was a fund called the CNA Fixed Income Fund ("the Fund"). *Id*. at ¶ 22. Until the end of 2011, a core investment of the Fund was a group annuity contract ("the Contract") offered by CAC, which at that time was a wholly owned subsidiary of CCC and thus an indirect subsidiary of CNA. *Id*. at ¶¶ 15, 24, 35. The Plan entered into the Contract in 1981. *Id*. at ¶ 3.

CAC was permitted to discontinue the Contract only in limited circumstances: the Plan's failure to qualify as a qualified pension, profit-sharing, or stock bonus plan under § 401(a) of the Internal Revenue Code; the failure of the Plan's trustee to make required contributions; or a decision by the Plan's trustee or sponsor to make other funding arrangements for the Plan. *Id*. at ¶ 26. The Plan, by contrast, could terminate the Contract at any time. *Id*. at ¶ 27. In 1990, the

Plan and CAC added a "Minimum Interest Guarantee Rider" to the Contract, which guaranteed that the annual interest rate credited to the Fund under the Contract would never fall below 4%. *Id*. at ¶ 3. The rider remained in place until December 31, 2011, when the Contract was discontinued pursuant to an agreement executed two days earlier between Northern Trust and CAC, which provided that "at the request of" the Plan's trustee, the Contract would be cancelled. *Id*. at ¶¶ 4, 35.

Prior to the Contract's cancellation, the Contract had earned returns at or above the 4% floor; it earned a 6.5% gross rate of return in 2007 and 2008, 6.25% in 2009, 4.55% in 2010, and 4% in 2011. *Id*. at ¶ 29. Because interest rates had fallen to much lower than those in place when the rider was executed in 1990, the 4% guarantee represented a favorable rate for the Plan. *Id*. at ¶ 32. In 2007, 2008, and 2009, the Fund had net rates of return of, respectively, 6.01%, 5.71%, and 4.88%, but following the Contract's cancellation in 2011—a year where the Fund earned a 3.26% return for the Plan—the Plan endured several years of declining earnings on assets invested in the Fund: 3.01% in 2012, 2.21% in 2013, 1.64% in 2014, and 1.54% in 2015. *Id*. at ¶ 37. Had the Plan not cancelled the Contract, the Plan's overall earnings during those years almost certainly would have been higher, because most of the Plan's funds had been invested in the Contract with its guaranteed a minimum 4% return, *id*. at ¶ 31. So the Contract's cancellation likely had significant negative financial consequences for the Plan.

Dolins alleges that the Contract's cancellation was not made with his and the other beneficiaries' interests in mind, but rather to improve CCC's financial position and/or to make CAC a more attractive target for potential buyers. *Id*. at ¶ 6. Specifically, Dolins alleges that the Contract's 4% guaranteed minimum return made the Contract unfavorable to CAC due to the declining interest rates and returns in the market as a whole, which led CNA to wish to sell

3

CAC—recall that CNA had a controlling interest in CCC, which in turn owned CAC—thus giving CNA and CAC an incentive to cancel the Contract. *Id*. at ¶¶ 33-34.

The complaint seeks relief against Defendants under §§ 502(a)(2) and (a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(2)-(3), which allow for damages for breach of fiduciary duty and equitable relief, respectively. In Count I, the complaint alleges that by acting to cancel the Contract, Defendants did not act for the exclusive benefit of Dolins and the other beneficiaries, in violation of § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and did not exercise ordinary care in engaging in the transaction, in violation of § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Doc. 1 at ¶¶ 51-64. Count II alleges that the Contract's cancellation was a prohibited transaction under § 406(b), 29 U.S.C. § 1106(b). Doc. 1 at ¶¶ 65-76. Count III alleges that the Contract's cancellation was a prohibited transaction under § 406(a), 29 U.S.C. § 1106(a). Doc. 1 at ¶¶ 77-87. And Count IV alleges that Defendants (other than CAC) are liable as co-fiduciaries under § 405(a), 29 U.S.C. § 1105(a), on the theory that each knowingly participated in the others' breaches of the others' fiduciary duties. Doc. 1 at ¶¶ 88-95.

## Discussion

### I. Defendants' Arguments as to the § 406(a) Claim

Count III alleges that the Contract's cancellation was a prohibited transaction under § 406(a)(1)(D). (Count III cites other subsections of § 406(a)(1), but Dolins concedes that only subsection (a)(1)(D) applies. Doc. 55 at 14 n.4.) Section 406(a)(1)(D) prohibits a fiduciary from engaging in a transaction if it "knows or should know that such transaction constitutes a direct or indirect … transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). Defendants argue that the Contract's cancellation is not the type of transaction prohibited by § 406(a)(1)(D). To evaluate this argument, the court must determine

whether the Contract—in particular, its guaranteed 4% minimum interest rate—was an "asset" of the Plan and, if so, whether its termination was a "use" or "transfer" of that asset "for the benefit of a party in interest."

ERISA provides that "[i]n the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy." 29 U.S.C. § 1101(b)(2). The Contract certainly was an "asset" of the Plan, but was its guaranteed minimum interest rate rider as well? The circuits have followed two approaches in determining whether something is a plan asset under ERISA. Citing *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984), the Ninth Circuit adopted a functional approach asking "whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries." *Acosta v. Pac. Enters.*, 950 F.2d 611, 620 (9th Cir. 1991). Other circuits, following Department of Labor guidance, have adopted a property rights approach, under which "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law." U.S. Dep't of Labor Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993); *see Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014); *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 427 (3d Cir. 2013); *Faber v. Met. Life. Ins. Co.*, 648 F.3d 98, 105 (2d Cir. 2011); *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 647 (8th Cir. 2007); *In re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005). The Seventh Circuit has not adopted either approach, and it is unnecessary to choose between them here because the Contract's guaranteed interest rate rider was a plan asset under both.

The guaranteed interest rate is a right to a formula-determined amount of money in the future. Because the Contract guaranteed that the annual return paid by CAC to the Plan would be at least 4%, the Plan effectively had a right to money equal to the difference between a 4%

return and whatever the return under the Contract would otherwise have been, assuming it fell below 4%. For example, had the Plan retained the Contract and its 4% interest rate guarantee in 2012, and if the Contract would have paid out 3.01% (the return that the Plan earned on the investments it actually had that year) absent the guarantee, the guaranteed interest rate provision would have resulted in the transfer from CAC to the Plan of 0.99% of the amount the Plan had invested in the Contract.

Both the functional approach and the property rights approach yield the conclusion that the Contract's guaranteed interest rate was an asset of the Plan. Functionally, the guarantee would have transferred money to the Plan in the event the Contract otherwise would have yielded less than a 4% annual return, which certainly was a possibility, and likely a probability, in the early part of this decade. CAC's being relieved of that obligation benefitted CAC at the expense of Dolins and the other beneficiaries. And from a traditional property rights perspective, a future interest in a guaranteed interest stream is a property right. *See Luna*, 406 F.3d at 1199-1200 (recognizing a future interest in payments as an asset for ERISA purposes).

So the guaranteed minimum interest rate was an "asset" of the Plan, but was its termination along with the Contract a "use" or "transfer" of the asset? As noted, the Contract effectively gave the Plan the right to a dollar amount from CAC equal to the difference between a 4% return and whatever the Plan otherwise have earned from the Contract. The Contract's termination effectively transferred that right back to CAC, for it no longer had to make good on its 4% guarantee. (If A has the right to an $X annual payment from B, and A gives up that right, it effectively transfers to B the right to the $X annual payment, with the result that B owes nothing to A.) Moreover, because CAC was partially owned by CNA, which was "a party in interest" as the employer of Plan beneficiaries, *see* 29 U.S.C. § 1002(14) (defining "party in

6

interest" in this context as including "an employer any of whose employees are covered by such plan"), the transfer was to a party in interest. And having alleged that a Plan asset was transferred to a party in interest, Dolins has properly pleaded the occurrence of a prohibited transaction under § 406(a)(1)(D).

## II. Northern Trust's Arguments

Northern Trust seeks dismissal of Counts I and IV, the claims alleging violations of §§ 404(a)(1) and 405(a), on the ground that it was a directed trustee and therefore did not violate any fiduciary duties. Doc. 41 at 5-10. The concept of a directed trustee stems from 29 U.S.C. § 1103(a)(1), which provides that in administering an employee benefit plan, a trustee may be "subject to the direction of a named fiduciary who is not a trustee, in which case the trustees shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to [ERISA]." In contrast to ordinary trustees, which are subject to traditional fiduciary duties of loyalty and care arising from both the common law and ERISA, *see Cent. States, Se. and Sw. Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 572 (1985), a directed trustee's duties are limited to the statutory duty of prudence, *see Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 406 (7th Cir. 2006). Under the duty of prudence, a directed trustee "can disobey the named fiduciary's directions when it is plain that they are imprudent." *Ibid*.

Northern Trust contends that Dolins has not alleged that it breached that duty, reasoning that it "is self-evident that, at the time of the cancellation, Northern Trust could not perform the hindsight comparison of return rates after cancellation." Doc. 57 at 9-10. But the complaint alleges not only declining returns *after* the Contract's cancellation, but also declining returns for several years *prior* to the cancellation. Doc. 1 at ¶ 37. Northern Trust saw multiple consecutive

7

years of declining returns approaching closer and closer to the Contract's guaranteed 4% floor, and rather than maintaining that floor for the Plan in what clearly appeared to be a declining market, it allowed the Plan to give it up for nothing in return. Although the evidence may show that Northern Trust had valid reasons for doing what it did, the court at this stage is limited to the complaint's well-pleaded factual allegations and the reasonable inferences drawn therefrom. Those facts give rise to a reasonable inference that Northern Trust's following the direction to relinquish the Contract in a declining market was plainly imprudent, thereby breaching its duty of prudence.

Northern Trust's argument for dismissal of Count I, the § 404(a)(1) claim, rests on the premise that it was not subject to fiduciary duties given its status as a directed trustee. But as just shown, Northern Trust remained subject to a duty of prudence, which it is plausibly alleged to have breached. As a result, the claim against Northern Trust in Count I survives.

Count IV, alleging that Northern Trust is subject to co-fiduciary liability under § 405(a), survives for the same reason. Citing 29 U.S.C. § 1105(b)(3)(B), which provides that "[n]o trustee shall be liable under this subsection for following instructions referred to in section 1103(a)(1) of this title," Northern Trust points out that "ERISA expressly limits the liability of directed trustees in the co-fiduciary context." Doc. 57 at 10. This is true, but beside the point; as the statute makes clear, § 1105(b)(3)'s liability shield extends only to transactions referenced in § 1103(a)(1), which in turn covers only those actions that comply with ERISA. *See* 29 U.S.C. § 1103(a)(1) ([T]rustees shall be subject to proper directions of such fiduciary which are … not contrary to this chapter … ."). As shown above, Dolins has adequately alleged that the Contract's cancellation *was* contrary to ERISA, so § 1105(b)(3) does not foreclose liability against Northern Trust, at least at the pleading stage.

Northern Trust seeks dismissal of Counts II and III, which allege prohibited transactions under §§ 406(a) and (b), on the ground that it was not a fiduciary with respect to the Contract's cancellation. Sections 406(a) and (b) provide that "[a] fiduciary with respect to a plan" shall not engage in various prohibited transactions. 29 U.S.C. §§ 1106(a)(1), (b). Liability turns on whether the defendant is a fiduciary with respect to a plan and, if so, whether the defendant engaged in a prohibited transaction. Northern Trust argues that because it acted as a directed trustee as to the Contract's cancellation, it is not a fiduciary and thus cannot be liable under § 406. In support, it cites *Lalonde v. Textron, Inc.*, 270 F. Supp. 2d 272 (D.R.I. 2003), which held that where an entity was not a fiduciary with respect to a plan's choice of investments, it could not be liable. *Id*. at 283. But on appeal, the First Circuit did not address that specific issue, and instead held only that the complaint did not adequately plead facts supporting a violation. *See Lalonde v. Textron, Inc.*, 369 F.3d 1, 7 (1st Cir. 2004). And significantly, the Supreme Court held in *Central States* that, as a general matter, trustees are fiduciaries. *See* 472 U.S. at 572 (describing an ERISA trustee's responsibilities as resulting in part from "general fiduciary standards"). It follows that Northern Trust, as a trustee (albeit a directed one), falls within the set of entities covered by §§ 406(a) and (b).

This conclusion follows from ERISA's definition of "fiduciary." The hallmark of fiduciary status under ERISA is the ability to act with discretion: "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any *discretionary* authority or *discretionary* control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice … with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any *discretionary* authority or *discretionary* responsibility in the administration of such

9

plan." 29 U.S.C. § 1002(21)(A) (emphasis added); *see Larson v. United Healthcare Ins., Inc.*, 723 F.3d 905, 917 (7th Cir. 2013) (noting that fiduciary status may vary based on what functions an entity serves with respect to a plan). Although directed trustees do not have unfettered discretion, they do have some:

> [A] directed trustee is not "subject to" a direction unless the direction is proper, made in accordance with the terms of the plan and not contrary to ERISA. Because the transaction at issue was allegedly a prohibited transaction, it would be "contrary to ERISA" and, therefore, the directed trustees may have retained discretion to reject the direction.

*Chesemore v. Alliance Holdings, Inc.*, 770 F. Supp. 2d 950, 970 (W.D. Wis. 2011). Because Northern Trust retained discretion to reject instructions regarding the Contract that were contrary to ERISA, it is properly considered a fiduciary in this context.

Northern Trust also contends that it cannot be held liable under § 406(b) because it is not alleged to have benefitted from the Contract's cancellation. Doc. 41 at 10-11. It is true that liability under § 406(b)(1), which provides that a fiduciary shall not "deal with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b)(1), requires that the defendant have benefitted from the transaction. But § 406(b)(2) imposes no such requirement. This is clear from its text, which reads: "A fiduciary with respect to a plan shall not … act in any transaction involving the plan on behalf of *a party* … whose interests are adverse to the interests of the plan or the interests of its participants and beneficiaries." 29 U.S.C. § 1106(b)(2) (emphasis added). There is no requirement in § 406(b)(2) that the defendant *itself* benefit from the transaction; it is enough that "a party" other than the beneficiaries have benefitted, and the complaint here alleges just that as to the CNA Defendants. Dolins has thus adequately alleged a violation by Northern Trust of § 406(b)(2), meaning that Count II may proceed against it.

### III. CNA Defendants' Arguments

The CNA Defendants seek dismissal only of Count III, which alleges that the Contract's cancellation was a prohibited transaction under § 406(a)(1)(D). First, they argue that because the Contract expressly provided for its own cancellation, the cancellation could not have been a prohibited transaction. Doc. 37 at 7-8. Specifically, they contend that "if [the Plan] was permitted to enter into the Contract in the first place, it is illogical to contend that ending the contract was a non-exempt prohibited transaction." *Id*. at 7.

There is nothing at all illogical about that contention. Contracting parties are subject to any number of additional duties other than those set forth in the contract, whether by implication, express agreement, or statute. For example, Illinois law recognizes an implied duty of good faith and fair dealing, which provides that parties may not take actions that, though consistent with the letter of a contract, amount to "tak[ing] advantage of each other in a way that could not have been contemplated at the time the contract was drafted or … do[ing] anything that will destroy the other party's right to receive the benefit of the contract." *Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 907 (Ill. 1996) (Freeman, J., specially concurring). Here, § 406(a)(1)(D) prohibited the CNA Defendants from taking certain actions that benefitted "a party in interest." 29 U.S.C. § 1106(a)(1)(D). If cancelling the Contract impermissibly benefited a party in interest, which it is alleged to have done, then the CNA Defendants may be liable even if the Contract's terms permitted cancellation.

Second, the CNA Defendants argue that the Contract's cancellation was not a "transaction" at all under § 406(a)(1) because the "ordinary and natural" meaning of "transaction" excludes the exercise of a unilateral right to cancel a contract. Doc. 37 at 8. That is incorrect, as the term "transaction" includes the discharge of a contract. *Black's Law*

*Dictionary* 1635 (9th ed. 2009) (defining "transaction" as "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract"). Here, Northern Trust and CAC (as noted, a wholly-owned subsidiary of CCC and therefore an indirect subsidiary of CNA) discharged the Contract in a way that is alleged to have benefitted parties in interest (the CNA Defendants) who were not plan beneficiaries. That is sufficient to qualify the cancellation as a "transaction."

Third, the CNA Defendants argue that the claim is untimely because the ERISA six-year statute of limitations, 29 U.S.C. § 1113(1), began to run in 1981, when the Contract was signed, not in 2011, when it was terminated. Doc. 37 at 8-9. To support this extremely weak argument, the CNA Defendants cite *Fish v. GreatBanc Trust Company*, 749 F.3d 671 (7th Cir. 2014). But *Fish* merely acknowledges ERISA's six-year limitations period; it does not say that if exercising a contractual provision is the alleged ERISA violation, the limitations period commenced when the contract was signed rather than when the challenged action occurred. Because the Contract was cancelled in December 2011 and the suit filed in September 2016, the claim is timely.

## IV. CAC's Arguments

CAC argues that it cannot be held liable in damages under § 502(a)(2) because it is not alleged to be a fiduciary. Dolins concedes the point, Doc. 59 at 5, and so the claims against CAC are dismissed to the extent they rely on § 502(a)(2).

CAC also argues that Dolins's request for equitable relief under § 502(a)(3) fails because he seeks only legal relief against it. Doc. 51 at 6-8; Doc. 65 at 5-8. CAC is right that § 502(a)(3) provides only for equitable relief; it allows "a participant, beneficiary, or fiduciary … to enjoin any act or practice which violates any provision of [ERISA], or … to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). But the complaint seeks equitable relief:

> Plaintiff and the Class seek to have the Plan recover damages or, in the alternative, to have the Plan's and their losses restored as *appropriate equitable relief*, and/or *seek other appropriate equitable relief, including but not limited to* disgorgement of profits, restitution, or surcharge, along with such other an additional relief enumerated in the Prayer and/or as may be otherwise available.

Doc. 1 at ¶ 64 (emphasis added). And Dolins elaborated in open court that the "other appropriate equitable relief" he is seeking includes rescission of the Contract's cancellation. So even if CAC is right that the monetary relief sought in the form of restitution is legal rather than equitable, rescission undoubtedly is the kind of equitable relief available under § 502(a)(3).

CAC next argues that even if Dolins were seeking equitable relief, his claims should be dismissed because the adequate remedies at law he has against the other defendants under § 502(a)(2) renders equitable relief under § 502(a)(3) not "appropriate." Doc. 65 at 5-8. In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Supreme Court held that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Id.* at 515. The Seventh Circuit has noted that "a majority of the circuits are of the view that if relief is available to a plan participant under subsection (a)(1)(B) [of § 502], then that relief is *un*available under subsection (a)(3)." *Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781, 805 (7th Cir. 2009).

Both *Varity* and *Mondry* address circumstances where the plaintiff seeks relief under §§ 502(a)(1)(B) and (a)(3); by contrast, Dolins seeks relief under §§ 502(a)(2) and (a)(3). Even if the logic of those decisions extended to the present circumstances, damages relief from the other defendants under § 502(a)(2) would not be adequate because Dolins seeks rescission of the Contract's cancellation, meaning reinstatement of the Contract, as a means of providing a prospective benefit to the Plan. And because the parties to the Contract were the Plan and CAC,

it is not clear how that relief could be ordered without leaving CAC in the case. Taking as true Dolins's allegations and drawing all reasonable inferences in his favor, the Plan has been injured by the Contract's cancellation, and it is conceivable that adequately remedying that might be accomplished only through its reinstatement. Dolins has therefore requested a remedy that is not provided for in § 502(a)(2) and can be accomplished only with CAC in the case by way of § 502(a)(3).

CAC also argues that the claims against it must be dismissed because the complaint fails to plead "facts sufficient to infer that CAC possessed actual or constructive knowledge that termination of the Contract constituted a fiduciary-duty breach." Doc. 51 at 9. CAC is wrong. For the reasons given in Part I, *supra*, cancellation of the interest rate guarantee was (at least on the facts alleged and with reasonable inferences drawn in Dolins's favor) inexplicable in light of the interest rate and market environment at the time. Furthermore, as the complaint alleges, CNA held an interest in CAC at the time of the cancellation. CAC had reason to know that the cancellation would benefit it and, by extension, CNA, to the Plan beneficiaries' detriment, by removing a significant liability from its books. This was plainly enough to give CAC "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

Finally, CAC contends that cancelling the Contract falls within § 408(b)(5), 29 U.S.C. § 1108(b)(5), which exempts from § 406 liability transactions involving "[a]ny contract for … annuities with one or more insurers which are qualified to do business in a State, if the plan pays no more than adequate consideration, and if each such insurer … is … a party in interest which is wholly owned (directly or indirectly) by the employer maintaining the plan." Doc. 51 at 13-14. The reference to "consideration" in § 408(b)(5) suggests that its concern is with entry into or

modification of contracts, not their termination.  Doc. 59 at 14-15.  It follows that the provision provides no basis for dismissal here.

## Conclusion

The motions to dismiss are denied, except for CAC's motion to dismiss the complaint's request for damages relief against it under § 502(a)(2).  Defendants shall answer the surviving portions of the complaint by September 8, 2017.

August 18, 2017

_____
United States District Judge